IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 26, 2017

**CHARLES D. SPRUNGER v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Cumberland County**
**No. 09-0212     David Patterson, Judge**

_____

**No. E2016-01096-CCA-R3-PC**
_____

The Petitioner, Charles D. Sprunger, appeals the Cumberland County Criminal Court's denial of his petition for post-conviction relief from his 2010 conviction for sexual exploitation of a minor and his eight-year sentence. The Petitioner contends that (1) he was denied his right to trial counsel of his choice because his "untainted" real property was seized before the trial pursuant to the civil asset forfeiture statutes and (2) he received the ineffective assistance of counsel. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT L. HOLLOWAY, JR., JJ. joined.

Jonathan R. Hamby, Crossville, Tennessee, for the appellant, Charles D. Sprunger.

Herbert H. Slatery III, Attorney General and Reporter; Robert W. Wilson, Assistant Attorney General; Bryant C. Dunaway, District Attorney General; and Amanda Worley, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case arises from the Petitioner's possessing more than 100 images depicting minors engaged in sexual activity. The Petitioner appealed his conviction, and this court affirmed the conviction and summarized the facts of the case as follows:

> On July 6, 2009, the defendant was indicted by a Cumberland County Grand Jury for aggravated sexual exploitation of a minor based on the discovery on his computer of more than 100 images of minors engaging in sexual activity after he took the computer to a repair business. The trial court

subsequently amended the indictment, reducing the charge to sexual exploitation of a minor.

At the defendant's August 19, 2010 trial, Tammy Arellano testified that in July 2008 she was working for a certified public accountant in Crossville. The accountant's stepson, McKinley Tabor, rented a space in the office for his computer repair business. Ms. Arellano said that her desk was positioned in a manner so that anyone coming to Tabor's office had to pass by her. She said that the usual practice for Tabor's customers was to leave their computers with their name and telephone number on a table located in front of her against the wall beside Tabor's office. On July 8, 2008, the defendant came in with his computer, saying he had talked to Tabor on the phone. The defendant placed the computer on the designated table and attached a note with his name and phone number.

McKinley Tabor, an outsourced IT manager, testified that he provided computer repair and consulting services, primarily for corporations. He also had a small office where individuals brought their computers for repair. On July 4, 2008, Tabor received a phone call from a man who identified himself as "Chuck" and said that he needed Tabor to restore data from the hard drive of his computer. Tabor told the man to bring the computer to his office the following Monday morning. The man telephoned Tabor at 1:00 p.m. that Monday and gave him the password so he could start the computer. While the computer was starting up, Tabor and the man discussed what material he wanted Tabor to restore. Tabor then noticed an icon on the computer indicating that files were waiting to be written to CD. The man asked Tabor to restore a specific program, as well as a Microsoft Money file. While the man was still on the phone, Tabor opened a folder on the computer to see if it contained the missing program. However, the folder actually contained photographs of "what appeared . . . to be pre-pubescent girls engaged in sexually suggestive poses and one of them appeared to be engaged in a sex act with an adult." Tabor told the man he would call him back later and then notified the police. After the police arrived, the folder containing the files waiting to be written to CD was opened, and it contained images of the same nature as the ones Tabor had found earlier. Tabor turned the computer over to Investigator Haynes.

Investigator John Haynes with the Cumberland County Sheriff's Department testified that he went to Tabor's repair shop on July 8, 2008, to investigate "a computer there with . . . possible child pornography images on it." Tabor hooked up the computer and "brought up a page of images that

appeared to be young people, eight, ten, twelve, fourteen years old, engaged in various sex acts and some in erotic poses." Investigator Haynes identified in court the computer he received from Tabor's shop and said that he subsequently delivered it to the Tennessee Bureau of Investigation ("TBI") for forensic analysis.

Melanie Garner, a special agent criminal investigator in the Technical Unit of the TBI, testified that she became a certified computer examiner in 2007. She conducted a forensic analysis on the defendant's computer and found several folders containing sexually explicit images of young children. The images were found in a backup folder dated April 7, 2008, on the main drive of the computer under "owners documents." The images were shown to the jury. Garner also found images of a young girl stored in a temporary folder waiting to be written to a CD. Garner identified a DVD containing a portion of the images retrieved from the original hard drive of the computer. Eight images were found in one folder and 120 images in another folder. She said that the images had a "fingerprint," meaning "basically a number, but it's a very long number and it's a unique fingerprint to that hard drive. And so that is how you verify that it's the same image." The fingerprint of the images linked them to the defendant's computer.

Garner said that, in her expert opinion, the images recovered from the defendant's computer were not the result of a virus. She elaborated that she had never seen a virus organized in a manner that would create different folders on a computer and that the files were found in a backup folder, "which is not typical if the virus is going to attack a computer, not typical that it will attack your backup folder." Further, a number of the images were located in an "allocated," meaning "that space where these are deleted out of the recycle bin, they are put in an allocated," and Garner had never seen a virus attack an allocated space. For a file to take this path and end up in an allocated, an individual had to physically take control of the computer. Garner said that she was "very confident" because of the verification of the fingerprint of the hard drive that all of the images came from the defendant's computer.

On cross-examination, asked if it would have been simpler for a hacker to have put the images on the computer rather than a virus, Garner said that "it would not be simpler." She said there was no evidence that a hacker had placed anything on the hard drive of the defendant's computer "[b]ecause you can see in the operating system of the computer."

Investigator Haynes, recalled by the State, testified that after he took the computer from Tabor's place of business, ownership of the computer was

established as belonging to the defendant. A search warrant was obtained and executed at the defendant's residence, which was located in a "completely secluded" area surrounded by "woods, underbrush. It look[ed] like you just force fed a house into the area somehow. It [was] completely grown up." Investigator Haynes, along with Investigator Norris and Deputy Rogers, executed the warrant and told the defendant they had taken possession of his computer from Tabor's shop and were there to look for anything that contained other child pornography. The defendant told the officers that they would not "find any more," which Investigator Haynes thought "a bit odd, ... indicat[ing] you've got all you're going to get." Deputy Rogers transported the defendant to the sheriff's department, and Investigators Haynes and Norris conducted the search. The defendant's house was in "absolute total disarray, just junk, dirty clothes, bags of trash." In the living room were a "pull-down screen that was probably six or eight feet wide and [went] from just about ceiling to floor" and a sectional couch with a projection type TV on a table in front of the couch. Between 500 and 1000 DVDs were located on shelves on the walls. On the couch and table were food items and a blanket, and it appeared that the defendant "was living on the couch, just in this home theater." The investigators confiscated a desktop computer in the upstairs loft area and two laptop computers in a downstairs closet.

Investigator Haynes said that after the search was completed, they returned to the sheriff's department and interviewed the defendant after advising him of his rights. The defendant never wrote or a signed a statement but did tell the officers that "he looked at porn on the internet. He said that the computer that [the officers] had was his and that he had had it for two to three years. Said that he lived in the house alone and that no one had access to the computer but him." Investigator Haynes acknowledged that they did not find any pornography in the defendant's house but said they did not search everywhere and only checked about one percent of the massive amount of DVDs they found.

The forty-two-year-old defendant testified that he worked between seventy and eighty hours a week at his landscaping business and acknowledged that he was a recluse. He said that he occasionally had guests, but they had nothing to do with his computer. He said that he bought and watched movies because he did not have cable television. He had Internet service but discontinued it the day after Investigator Haynes came to his house. He denied ever seeing the images on his computer and said he did not know how they had gotten onto his computer. He said that the only thing he had ever burned from his computer was "an annoying pop-up that said do you

-4-

want to make a back-up of this computer, or a system backup or something like that. And the thing kept popping up every time I turned the computer on, I got tired of it and I burned it." The defendant denied telling Investigator Haynes that he would not find "any more" child pornography at his house, saying that he told the investigator he would not find "any."

*State v. Charles D. Sprunger*, No. E2011-02579-CCA-R3-CD, 2013 WL1385708, at *1-3 (Tenn. Crim. App. Apr. 5, 2013), *perm. app. denied* (Tenn. Aug. 21, 2013).

On March 27, 2012, the Petitioner filed a petition for post-conviction relief, which the post-conviction court stayed pending the outcome of the appeal of the Petitioner's conviction. The Petitioner alleged, in relevant part, that he received the ineffective assistance of counsel and that his right to his counsel of choice was violated because his real property was seized and forfeited before the trial.

At the post-conviction hearing, the Petitioner testified that in July 2008, the police executed a search warrant of his home and that in July 2009, he was indicted. He said that on May 20, 2009, the police served him with a seizure and forfeiture notice of his home and that the notice provided no instructions about how to challenge the forfeiture. He said that he was incarcerated in October 2011 when the forfeiture trial occurred. He said that his written request for an appointed attorney to represent him at the forfeiture trial in chancery court was denied and that he submitted an affidavit of indigency with his request. He recalled participating in the trial by telephone from the correctional facility because his request for a transport order was denied. He said that he thought the trial was only a hearing, that he was told by someone he thought was a court secretary that he could speak to an attorney, and that he was not prepared for a trial. He said the trial was thirty to four-five minutes.

The Petitioner testified that at the forfeiture trial, he requested but was denied permission to read into the record the "brief" he submitted to the chancellor. The Petitioner said that in his brief, he stated the State failed to provide him "notice" about how to "claim his property," that the State's failure violated the law, and that the chancellor permitted the State to seize his property. He said that the forfeiture warrant was served upon him in May 2009, two months before the indictment was returned. He said that the civil paperwork he received when he was in jail showed that his property was being seized because he was guilty of aggravated sexual exploitation of a minor. He recalled the original indictment alleged he had committed aggravated sexual exploitation of a minor but that the charge was reduced to sexual exploitation of a minor at his first court appearance.

The Petitioner testified that he contacted an attorney in July 2008, that the attorney told him to bring the "charge sheet" to the attorney after he had been charged, and that he complied with the attorney's instructions after the indictment was returned in July 2009.

He said that the attorney's quoted fee was $13,000, that he did not have cash for the fee, that he had adequate equity in his home to pay the fee, but that he was not permitted to utilize the equity because the State had already seized his property. The Petitioner said that he ultimately contacted trial counsel, who thought the Petitioner qualified for pretrial diversion, and that he paid counsel's $5,000 fee.

The Petitioner testified that trial counsel's only office computer was at his secretary's desk and that counsel was unfamiliar with the Internet and computers. The Petitioner said that counsel's only trial strategy was that counsel wanted the jury to like the Petitioner but that two or three weeks before the trial, counsel said he did not know what defense to present. He recalled that counsel wanted to hire an expert, that he told counsel he did not have money to hire an expert, and that counsel did not respond. He said counsel did not discuss obtaining State funds to hire an expert or mention an expert again.

The Petitioner testified that trial counsel filed a pretrial motion to exclude the evidence from the computer because the State's forensic report stated the computer was not operational. He said that the State was afforded extra time after the suppression hearing but before the trial court made a determination on the motion in order for the State to attempt to get the computer operational. The Petitioner said that the State was able to get the computer operational and that the trial court denied the motion to suppress about one to three days before the trial began. The Petitioner said that he and counsel discussed obtaining a continuance after the suppression motion was denied but that counsel said "we just need" to proceed to the trial. The Petitioner said that he and counsel both thought it was odd the computer became operational just before the trial, although an extended time had elapsed since the computer was seized.

The Petitioner testified that had he been able to access the equity in his property, he would have hired the first attorney he consulted. The Petitioner also said he would have partitioned and sold a portion of his 6.2-acre property in order to pay the attorney's $13,000 fee and to keep his home without accessing the equity. He said that his property had road frontage and estimated that it could have easily sold for $100,000. He said that had the bank wanted the promissory note on the home paid, he would have had $50,000 remaining for attorney's fees. He said that the State's seizing all his property prevented him from partitioning and selling his property and that the State would have obtained an injunction preventing him from obtaining any proceeds from a sale.

The Petitioner testified that he appealed the chancery court's forfeiture order and that the Tennessee Supreme Court granted his application for permission to appeal and determined that the seizure of his property was unlawful because the State failed to provide him proper instructions relative to recovering his property. He said, though, that by the time the opinion was released, his home had already been sold at auction and that the State paid

him approximately $31,000. He said that the money remaining from the State's payment would be used to pay taxes, penalties, and interest, which were "on hold" during his incarceration.

The Petitioner testified that trial counsel did not know what questions to ask of the State's witnesses at the trial and that counsel's cross-examinations were inadequate. The Petitioner said he told counsel that Investigator Haynes's testimony relative to the Petitioner's saying during the search that the investigator would not find "anymore" child pornography was false but that counsel did not question the investigator about the Petitioner's saying the police would not find "anything." The Petitioner said that counsel referred to the Petitioner as "an odd fellow" during the investigator's testimony and told the jury the Petitioner was "an odd duck."

The Petitioner testified that trial counsel asked if he wanted to testify, that he decided to testify, and that counsel did not prepare him for his testimony or review the risks associated with his testifying. The Petitioner said that he told counsel he had been diagnosed with Asperger Syndrome but that they did not discuss it in detail, although counsel mentioned the Petitioner's light sensitivity as an explanation for his wearing tinted glasses inside the courtroom. He said that counsel did not understand what the sexual exploitation of a minor statute criminalized because counsel thought the statute required the photographs to depict minors in "sexual positions," not merely nude photographs.

The Petitioner testified that he told trial counsel about the computer problems causing him to take his computer to Mr. Tabor but that counsel did not appear interested in determining whether the photographs could have been placed on his computer as the result of a virus. He said that although the trial transcript did not reflect it, counsel was not prepared for the forensic examiner's testimony that a virus could not have caused the photographs to appear on his computer. The Petitioner said counsel "stumbled over that answer."

On cross-examination, the Petitioner testified that his bond was $50,000, that he paid $5,000 for his release, and that the forfeiture notice had attached to his property by the time he obtained pretrial release. He said, though, he paid his bond with credit cards and continued operating his own business. He said that in 2008, he and his mother co-owned his mother's property, which was valued between $60,000 and $70,000. He agreed that on July 10, 2008, he divested his interest in his mother's property by a quitclaim deed when he learned of the police investigation.

The Petitioner testified that he told trial counsel that he could not afford to hire an expert and that he could not have used his interest in his mother's property as collateral because of two liens on the property for approximately $40,000. He said that he divested his interest in the property because he wanted his mother to be free of restrictions in the event he

were convicted and incarcerated. He agreed he divested his interest about one year before he was indicted.

The Petitioner testified that trial counsel asked various trial witnesses about computer viruses and hacking but that the Petitioner did not provide counsel any information or insight about which questions to ask the witnesses because they did not discuss what questions to ask any of the witnesses. He agreed that counsel asked him to remove his glasses during jury selection to humanize the Petitioner and to explain the reason the Petitioner wore tinted glasses. He agreed that counsel's references to Asperger Syndrome were made in an effort to explain Investigator Haynes's testimony regarding the Petitioner's lack of emotion and reaction when the Petitioner was told his computer contained child pornography. The Petitioner denied his computer was password protected but explained that the "password was put on there by me in my attempts to get the password that was on the computer that I did not put on there off." The Petitioner said he asked Mr. Tabor to remove the password because it was a nuisance. The Petitioner agreed that nobody but he and Mr. Tabor had access to his computer and that he was reclusive and a loner.

The Petitioner testified that the computer analyst who examined his computer displayed photographs from his computer to the jury. He said that although he had approximately $31,000, he chose to use the money to pay his taxes instead of an expert to show the photographs were placed on his computer by a hacker or virus. He said that his mother died and that he received approximately $31,000 in equity in her home and agreed his bank account contained $28,000, which was the amount paid to him by the State for the unlawful seizure and forfeiture of his home.

On redirect examination, the Petitioner testified that $3,000 or $4,000 of his bond was paid by credit cards and that he had at least $13,000 in credit card debt. He agreed the taxes he had not yet paid and the credit card debt "wiped out" any money contained in his bank account. Relative to his mother's home, he explained that his mother was required to pay his former stepfather $17,000 upon their divorce, that his mother did not have the money, and that a bank would only loan the money to her if the Petitioner became a co-signor. He said this allowed his mother to remain in her home. He said he divested his interest in the home because he did not want his mother to encounter any complications in the event he were sent to prison. He denied knowing the State could seize his property at the time he divested his interest. He said the quitclaim deed was to protect his mother's interest in the home.

Trial counsel testified that he did not tell the Petitioner that the Petitioner would not spend any time in prison because he could not guarantee the outcome of a case. Counsel said that just before the trial began, he learned that the forensic analyst who examined the computer identified the wrong machine as the one containing child pornography. He said that after considering the information, counsel told the trial court that the identity of the

machine did not impact the chosen defense. Counsel said that this case was determined by expert testimony relative to how the material was placed on the computer and that a defense expert might have made a "significant difference." He agreed he told the Petitioner that he did not know how to defend the Petitioner without an expert. Counsel said that it would have been better to advise the court that he needed a continuance in an effort to convince the Petitioner to hire an expert. Counsel noted that the Petitioner did not change his mind after making a decision and said that the Petitioner was not willing to hire an expert. Counsel said that the Petitioner commented he did not have funds for an expert but that the Petitioner did not explain his financial situation. Counsel said that the Petitioner's memory might have been better than counsel's but that counsel thought the Petitioner had simply decided not to spend money to hire an expert. Counsel said the Petitioner never mentioned being unable to pay counsel's fee. He said that after hearing the Petitioner's testimony regarding his desire to hire the first attorney the Petitioner consulted, he regretted being the Petitioner's counsel of choice as a result of economics. Counsel stated that he cross-examined the forensic analyst who identified the wrong computer and that this was not the analyst's only "shortcoming."

On cross-examination, trial counsel testified that although the Petitioner mentioned that the Petitioner did not have money for an expert, counsel believed the Petitioner simply made a decision not to spend money on an expert. Counsel said that he did not "press" the Petitioner about his reasons for not hiring an expert, that he did not explore the possibility of obtaining state funds for an expert, and that he was unaware he could have sought state funds. He agreed he referred to the Petitioner during the trial as an odd duck and said he had to "cultivate the jury" without misleading the jury. Counsel said he considered himself to be an odd duck and thought it was an admirable trait.

Trial counsel testified that he referred to Investigator Haynes as a "top notch investigator" and that he did not want to mislead the jury to think otherwise. He said that his experience showed the investigator was ethical and competent and that he wanted to show the jury ethical and competent investigators could make mistakes or misremember the Petitioner's statements. Counsel said that in his opinion, it would have been unproductive to attempt to denigrate the investigator.

Trial counsel testified that during trial preparation, he noticed that the computer identified by the State as the machine containing the photographs did not contain the photographs. He said that the photographs were on a different computer found inside the Petitioner's home but that the computer was not identified by the State as the computer to be presented at the trial. He said he prepared for trial based upon this information but knew the mistake could have been discovered and the correct computer admitted as evidence.

Trial counsel testified that an expert witness was essential to this case, that he "pushed" the Petitioner for an expert witness, and that the ultimate decision to obtain an expert belonged to the Petitioner. Counsel did not think the Petitioner was indigent and said he "imagine[d] he would have discovered" the Petitioner's indigency. Counsel said, though, the Petitioner was "steadfast" that he did not have money and was not hiring an expert. Counsel recalled that the Petitioner did not inquire about the potential cost of an expert and that the Petitioner's only response on the topic was no. Counsel said he and the Petitioner discussed the need for a defense expert to explain to the jury from where the photographs came and that the defense should not rely upon the State's expert.

Trial counsel testified that his proficiency with technology and computers was "less than zero," that he explained his lack of knowledge to the Petitioner, and that he did not attempt to learn about computers in preparing the Petitioner's defense. He agreed he did not have a computer on his desk. He said he inspected the Petitioner's computers at the sheriff's office during discovery and thought the materials from the computer were placed on a compact disc.

The post-conviction court denied relief at the conclusion of the hearing. The court found that the Petitioner's position was based upon financial considerations, that he did not want to pay the large fee quoted by the first attorney he consulted, and that he paid trial counsel's reduced fee. The court found that the Petitioner understood counsel was a "1970's throwback," who had no computer on his desk.

The post-conviction court found that the quitclaim deed related to the Petitioner's mother's property and the affidavit of indigency submitted with the post-conviction petition showed that the Petitioner had the financial means to hire an expert for the post-conviction hearing. The court noted that it had determined that Petitioner was indigent based upon the affidavit submitted by the Petitioner. The court found, though, that the Petitioner had the financial means to hire an expert to testify at the post-conviction hearing to show what the expert's testimony would have been at the trial and whether such testimony would have affected the outcome. The court also found that the Petitioner could have utilized the nearly $30,000 to hire an expert for the trial but chose not to hire anyone.

The post-conviction court found that the trial evidence was strong and that trial counsel presented a good defense based upon the State's evidence. The court credited counsel's testimony that he told the Petitioner a defense expert was necessary but that the Petitioner decided not to spend his money for an expert. The court found that counsel's not asking the Petitioner if he had the financial means to hire an expert was of no consequence because the evidence showed the Petitioner had the means to hire an expert. The court credited counsel's testimony that the Petitioner did not want to hire or to spend his money for an expert.

The post-conviction court found that trial counsel's "odd duck" comment during the trial and his not researching "computer matters" before the trial were "well explained" by counsel. The court found that the allegation counsel did not challenge the State's expert's testimony was without merit and that counsel cross-examined the expert about viruses and other "potential things" that could have caused the photographs to appear on the computer. The court found that no evidence showed counsel failed to investigate this case.

The post-conviction court found that although the Petitioner's real property was unlawfully seized based upon the State's failure to comply with a procedural requirement, the seizure had "some legitimacy." The court refused to find that the Petitioner did not have the funds to hire an expert of his choice based upon the return of the proceeds from the sale of his property. The court found that the equity in the Petitioner's mother's home provided the Petitioner the means to hire the first attorney he consulted but that the Petitioner chose to divest himself of his interest in the property.

In the post-conviction court's written order filed after the hearing, the court found that at the time of the trial, the Petitioner had the financial means to hire a defense expert. The court found that two days after law enforcement disclosed the nature of the investigation to the Petitioner, the Petitioner "quit-claimed" his interest in his mother's home to her and that his interest was valued at approximately $15,000. The court found that this equity could have been used to hire the expert trial counsel believed was necessary for a successful defense. The court found that the Petitioner paid his bond for pretrial release, worked at his business, and hired counsel before the trial. The court found that counsel's assessment that the Petitioner was not indigent before the trial was accurate and that the Petitioner did not want to spend money for an expert.

The post-conviction court found that at the time of the post-conviction hearing, the Petitioner owned a $30,000 interest in his deceased mother's home and had $28,000 in a bank account. The court found that although the Petitioner had debts, he had the financial means to hire an expert. The court noted that the Petitioner did not present an expert at the post-conviction hearing and found that no evidence showed the outcome of the trial would have been different had an expert been presented at the trial.

The post-conviction court found that the Petitioner had failed to show that trial counsel provided deficient performance or that any deficiency resulted in prejudice. The court found that counsel testified at the hearing regarding his "sound reasoning" for his questions and comments at the trial and for his advice to the Petitioner. This appeal followed.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2012). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2012). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

## I.       Sixth Amendment Right to Counsel of Choice

The Petitioner contends that his Sixth Amendment right to counsel of his choice was violated because his real property was illegally seized by the State before the trial. He argues that this "tied [his] hands," precluding him from utilizing the equity in his home to hire his counsel of choice, who was the first attorney he consulted with a $13,000 fee, and to hire his expert of choice. The State responds the Petitioner is not entitled to relief.

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the assistance of counsel. Although "the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate . . . rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat v. United States*, 486 U.S. 153, 159 (1988); *see State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003). Therefore, a defendant who "desires and is financially able to retain his own counsel 'should be afforded a fair opportunity to secure counsel of his own choice,'" but the right to have counsel of choice "must be balanced against the requirements of the fair trial and proper administration of justice." *State v. Huskey*, 82 S.W.3d 297, 305 (Tenn. Crim. App. 2002) (quoting *Powell v. Alabama*, 287 U.S. 45, 53 (1932); *United States v. Micke*, 859 F.2d 473, 480 (7th Cir. 1988)).

The record reflects that the Petitioner did not raise this issue in the appeal of his conviction. *See Charles D. Sprunger*, 2013 WL 1385708, at *1. A ground for post-conviction relief is "waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented[.]" T.C.A. § 40-30-106(g) (2012). However, an issue is not waived "[i]f the claim for relief is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right[.]" *Id.* at (g)(1). The Petitioner relies on *Luis v. United State*, --- U.S. ---, 136 S. Ct. 1083 (2016), to support his claim that his constitutional right to his counsel of choice was violated by the State's seizure and forfeiture of his real property.

The Post-Conviction Procedure Act defines a new rule of constitutional criminal law as one in which the "result is not dictated by precedent existing at the time the petitioner's conviction became final and application of the rule was susceptible to debate among reasonable minds." T.C.A. § 40-30-122 (2012). Furthermore, a new rule of constitutional criminal law "shall not be applied retroactively in a post-conviction proceeding unless the new rule places primary, private individual conduct beyond the power of the criminal law-making authority to proscribe or requires the observance of fairness safeguards that are implicit in the concept of ordered liberty." *Id.*

The defendant in *Luis* was indicted for paying kickbacks, conspiring to commit fraud, and engaging in other criminal conduct related to the healthcare field. The Government alleged that *Luis* had obtained $45 million by fraudulent means and that she had spent almost all of it. However, before the trial, the Government sought and obtained an order prohibiting *Luis* from dissipating nearly $2 million, which included untainted funds that were unconnected to her alleged criminal conduct. The parties agreed that the pretrial order prevented *Luis* from using her untainted funds to hire an attorney to defend her in the criminal proceedings. *Luis*, --- U.S. at ---, 136 S. Ct. at 1087-88. The Supreme Court, in a plurality opinion, determined that "the pretrial restraint of legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment." *Id.* at 1088.

However, the right to counsel of choice is not a new constitutional right. The Supreme Court concluded long ago that, pursuant to the Sixth Amendment, a defendant "should be afforded a fair opportunity to secure counsel of his own choice" when the defendant has the financial means. *Powell v. Alabama*, 287 U.S. 45, 53 (1932); *see Wheat v. United States*, 486 U.S. 153, 159 (1988). Although "[a] choice-of-counsel violation occurs whenever the defendant's choice is wrongfully denied" and is structural error, the right to counsel of choice is not unlimited. *United States v. Gonzales-Lopez*, 548 U.S. 140, 148-150 (2006). Likewise, courts have determined the principles in *Gonzales-Lopez* are not to be applied retroactively in collateral proceedings because the *Gonzales-Lopez* Court determined that "the right to be represented by counsel of choice protects an interest in autonomy rather than the accuracy of the trial" and that the nature of the right "requires the trial to be rerun even when there was no prejudice." *Rodriguez v. Chandler*, 492 F.3d 863, 866 (7th Cir. 2007). The *Rodriguez* court determined that the nature of the rule prohibits retroactive application in a collateral attack. *Id.* (citing *Whorton v. Bockting*, 549 U.S. 406 (2007)); *see William Jordan Claybrooks v. Bobby Shearin, Warden*, No. PJM-09-0971, 2009 WL 216016, at *3 (D.Md. July 16, 2009) (concluding *Gonzales-Lopez* does not apply retroactively in habeas corpus proceedings); *Henry Delmar Peters v. Thomas K. Bell*, No 1:06-cv-880, 2007 WL3348011, at *1 (W.D. Mich. Nov. 8, 2007) (concluding *Gonzales-Lopez* does not apply retroactively in habeas corpus proceedings).

-13-

Following *Gonzales-Lopez*, the Supreme Court's focus in *Luis* was that the assets at issue had not been established to be tainted, or the product of alleged criminal conduct, before the trial, and the Court concluded that the untainted nature of the funds was distinguishable from the assets in previous cases. *Luis*, --- U.S. at ---, 136 S. Ct. at 1089-90. *Compare United States v. Monsanto*, 491 U.S. 600, 614-16 (2016) (concluding that a defendant's tainted assets may be seized pretrial even when the tainted assets would be used to retain counsel of choice), *with Caplin and Drysdale, Chartered v. United States*, 491 U.S. 617 (2016) (concluding that post-conviction forfeiture of assets that would have been used to hire counsel of choice did not violate the Sixth Amendment because the funds were linked to the alleged criminal conduct). It is the seizure and forfeiture of untainted funds, which are not connected to the alleged criminal conduct, that violates a defendant's right to obtain counsel of the defendant's choice. *Luis*, --- U.S. at ---, 136 S. Ct. at 1096.

In any event, we need not determine here whether *Luis* created a constitutional right not recognized as existing at the time of trial that requires retroactive application in a collateral proceeding. Although the Petitioner alleges that his real property was an asset untainted by his criminal conduct, the supreme court opinion reversing and vacating the forfeiture of the Petitioner's property was not based upon whether the Petitioner's property was subject to seizure and forfeiture as a result of his conduct. *See State v. Sprunger*, 458 S.W.3d 482 (Tenn. 2015). The supreme court's focus in *Sprunger* was the State's failure to strictly comply with the procedural requirements delineated in the civil forfeiture statutes, and the court concluded that this noncompliance required the forfeiture order to be vacated and the excess proceeds to be returned to the Petitioner. *Id*. at 498-501. The court never discussed the substantive basis for which forfeiture was sought and did not address whether the property was tainted by the Petitioner's criminal conduct. *See id*. at 500 ("[W]e need not determine whether the trial court erred in holding that Mr. Sprunger 'used' his home 'in the commission of' possessing child pornography[.]"). The court concluded that when the procedural requirements of the statutes have not been satisfied, "no forfeiture or confiscation has occurred." *Id*. As a result, the record before this court reflects no finding relative to whether the property was untainted, which would have prevented the State from seeking forfeiture before the trial, the procedural noncompliance notwithstanding, or whether the property was tainted, which would have allowed the State to seek seizure and forfeiture before the trial. Likewise, no evidence was presented at the post-conviction hearing regarding the tainted or untainted nature of the Petitioner's property. Therefore, the Petitioner is not entitled to relief on this basis.

Although we conclude that the Petitioner is not entitled to relief on his counsel of choice claim, we note that any finding by the post-conviction court that the Petitioner possessed sufficient financial means at the time of the trial to hire an expert is not supported by the record. The evidence shows that the search warrant of the Petitioner's home was executed in June 2008, that the Petitioner divested his interest in his mother's home in July

-14-

2008, that the State obtained the forfeiture warrant in May 2009, that the Petitioner was indicted in July 2009, and that the Petitioner received notice of the seizure in August 2009, which effectively prevented him from accessing the equity in the home and from obtaining a loan. After the indictment was returned, the Petitioner paid trial counsel's $5,000 fee and paid $5,000 to secure his pretrial release, a portion of which was paid by credit card. The Petitioner was convicted after a jury trial in 2010. On October 24, 2011, the forfeiture trial was held, and at the conclusion of the trial, the court ordered the forfeiture of the proceeds from the sale of the Petitioner's home. *See Sprunger*, 458 S.W.3d at 485-91. Our supreme court's opinion, vacating the forfeiture of the proceeds and remanding the case to the trial court with instructions to enter an order directing the return of the proceeds to the Petitioner, was not filed until March 5, 2015. Presumably the $28,000 was returned to the Petitioner after the supreme court opinion was filed, but no evidence at the post-conviction hearing shows when the funds were returned to the Petitioner. Therefore, no evidence shows that the Petitioner had received any money at the time of the trial, although the Petitioner had received the funds by the time of the post-conviction hearing as reflected in his post-conviction affidavit of indigency.

The record also reflects that regardless of the Petitioner's intention behind divesting his interest in his mother's home, the Petitioner divested his interest in July 2008, one year before he was indicted. Likewise, no evidence was presented regarding when the Petitioner's mother died, resulting in the Petitioner's inheriting $30,000 interest in the home according to the Petitioner's affidavit of indigency. Again, no proof shows the Petitioner had sufficient financial means at the time of the trial to hire an expert, although the Petitioner had the financial means to hire an expert to testify at the post-conviction hearing.

## II.     Ineffective Assistance of Counsel

The Petitioner contends that trial counsel provided the ineffective assistance of counsel by (a) referring to him as an "odd duck" during the trial, (b) commenting on the proficiency and reliability of the State's trial witnesses, (c) failing to "immerse himself" in basic research regarding computers and viruses, and (d) failing to know he could request State funds to hire an expert witness. The State responds that the Petitioner did not receive ineffective assistance.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364,

368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a petitioner must show that "the advice given, or the services rendered . . . , are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

## A.    Odd Duck Comment

The parties do not dispute that trial counsel referred to the Petitioner as an odd duck at the trial. The Petitioner testified that he told counsel he had been diagnosed with Asperger Syndrome. The Petitioner conceded that counsel mentioned his diagnosis and his light sensitivity during the trial to explain to the jury why he wore tinted eyeglasses in the courtroom. The Petitioner agreed that counsel asked the Petitioner to remove his glasses during jury selection to humanize the Petitioner. The Petitioner also agreed that counsel's references to Asperger Syndrome were an effort to explain Investigator Haynes's testimony that the Petitioner lacked emotion and reaction when the Petitioner was informed the computer contained child pornography. The Petitioner agreed counsel's comment was meant to humanize him. Counsel also referred to the Petitioner as an odd duck because counsel said he wanted to "cultivate" the jurors about the Petitioner without misleading them. The record reflects that counsel's comments were meant to humanize the Petitioner, who had

-16-

been charged with possession of more than 100 images of child pornography, which, as the Petitioner notes in his brief, is an offense that "holds . . . stigma." Counsel made a strategic decision about how best to present the Petitioner to the jury in light of the charged offense. The record does not preponderate against the post-conviction court's determination that the Petitioner did not receive the ineffective assistance of counsel. The Petitioner is not entitled to relief on this basis.

## B.      Proficiency and Reliability of the Investigating Officer

The defense theory at the trial was the Petitioner did not place the unlawful images on his computer but that someone or something else, such as a hacker or a virus, caused the images to appear. Investigator Haynes testified at the trial that during the search of the Petitioner's home, the Petitioner stated that the police would not "find anymore" images. Investigator Haynes believed the statement indicated the police had found all of the unlawful images. Investigator Haynes acknowledged, though, that no images were found inside the Petitioner's home. The Petitioner testified that he told Investigator Haynes during the search that the police would not find "any" images, not that the police had found all the images.

At the post-conviction hearing, trial counsel testified that he referred to Investigator Haynes as a "top notch investigator" and that he made a strategic decision not to mislead the jury to think Investigator Haynes was a poor investigator. Counsel said that his trial experience showed that the investigator was ethical and competent and that attacking or denigrating an investigator was unproductive. Counsel said he attempted to show the jury that an ethical and competent investigator could make mistakes and could have misunderstood the Petitioner's statement during the search. Counsel made strategic decisions not to attack the investigating officer and to attempt to show that the best law enforcement officer was capable of mistakes. Counsel's decisions were reasonable based upon the State's evidence, the lack of a defense computer expert, and the defense theory that the photographs were the result of a virus or a computer hacker. Furthermore, the jury was presented with Investigator Haynes's and the Petitioner's versions of what the Petitioner said during the search. The record does not preponderate against the post-conviction court's determination that the Petitioner did not receive ineffective assistance. The Petitioner is not entitled to relief on this basis.

## C.      Counsel's Lack of Research on Computers and Viruses

Trial counsel testified that his proficiency with technology and computers was "less than zero" and that he did not have a computer on his office desk. Counsel told the Petitioner about his lack of knowledge, and counsel admitted he did not attempt to learn about computers in preparing the Petitioner's defense. However, counsel inspected the Petitioner's computers at the sheriff's office during discovery, knew before the trial that the

State had identified the wrong computer as the one containing the photographs, and cross-examined the State's witnesses about computer viruses and hacking.

We conclude that although the record reflects that the Petitioner knew he did not retain a computer-savvy attorney, this case was rooted in computer science and Internet technology. Counsel testified that specialized knowledge regarding these matters was required for the defense but that the Petitioner did not want to hire an expert. Counsel knew no defense expert would testify at the trial, and therefore, should have garnered some knowledge about the technological aspects governing the State's case against the Petitioner. Counsel's choice not to research the relevant technology given the issues in this case was deficient performance.

The Petitioner has failed to offer any proof and nothing in the record indicates this decision impacted the result of the trial. The evidence against the Petitioner was strong. The State's proof showed that more than 100 sexually explicit images of young children were found on the Petitioner's computer. The TBI analyst testified that the images' fingerprints were "linked" to the Petitioner's computer and that no evidence showed the computer was infected with a virus or that another person hacked into the computer to download the images. Furthermore, the Petitioner admitted to the police that he viewed pornography on the Internet, that he lived alone, and that nobody had access to his computer. The computer was password protected, and the Petitioner provided the password to the repairman who discovered the images. No evidence shows research by counsel would have affected the outcome of the trial. The record does not preponderate against the trial court's determination that the Petitioner did not receive ineffective assistance. He is not entitled to relief on this basis.

### D.     Counsel's Failure to Request State Funds to Hire an Expert

The Petitioner's argument focuses on trial counsel's failure to "press" the Petitioner about his financial status in order to determine whether the Petitioner had the financial means to retain an expert or whether the Petitioner was indigent. The Petitioner also focuses on counsel's lack of knowledge that an indigent defendant could request State funds for the purpose of hiring a defense expert.

Trial counsel's credited testimony reflects that counsel told the Petitioner that an expert witness was necessary and critical to the defense. The Petitioner and counsel both testified that the Petitioner commented that the Petitioner did not have funds for an expert. However, counsel believed that the Petitioner simply chose not spend money to hire an expert. Counsel did not question the Petitioner about his reasoning for not attempting to hire an expert and said he did not know he could seek expert funds from the State for an indigent defendant.

The Petitioner and trial counsel failed to communicate adequately relative to why the Petitioner adamantly did not want to hire an expert. Counsel and the Petitioner knew an expert was critical to the chosen defense, and therefore, counsel should have discussed the matter fully with the Petitioner in order to determine whether the Petitioner was indigent. In any event, counsel said he was unaware he could seek state funds to hire an expert for an indigent defendant. We conclude that counsel's lack of knowledge about the ability to seek state funds for an expert and his failure to question his client about the refusal to hire an expert was deficient performance.

However, the Petitioner has failed to establish prejudice. The record reflects that the Petitioner paid counsel's $5,000 fee. Counsel told the Petitioner that an expert was necessary to the defense, and counsel said the Petitioner was unwilling to hire an expert. Furthermore, the Petitioner has failed to establish that a request for state funds would have been granted by the trial court. The record reflects that at the time of the post-conviction hearing, the Petitioner's bank account contained approximately $28,000 and that the Petitioner could have used these funds to present an expert at the post-conviction hearing to show what a defense expert's testimony would have been at the trial. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). The record does not preponderate against the post-conviction court's determination that the Petitioner received the effective assistance of counsel. He is not entitled to relief on this basis.

Based upon the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE

-19-